# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | No. 17-cr-346 |
| v. ) | |
| ) | Judge Robert M. Dow, Jr. |
| ARTEMIO RAMIREZ, et al. ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

For the reasons set forth below, Defendant's motion to suppress [46] is denied. This case remains set for further status hearing on November 5, 2019 at 9:00 a.m.

**I.  Background**

After considering the parties' briefs and the live testimony of the officers[1] and Defendant's girlfriend, and making any necessary credibility determinations, the Court sets forth the following recitation of the facts surrounding the encounter between Defendant and the law enforcement officers that gave rise to the motion to suppress currently before the Court.

Defendant Artemio Ramirez is charged with conspiracy to possess a controlled substance with intent to distribute, in violation of 21 U.S.C. 846, and possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. 841(a)(1). On May 23, 2017, law enforcement officers observed Defendant meeting with a suspected drug courier. They followed Defendant's vehicle and stopped it behind his apartment building. Subsequently, they searched Defendant's apartment and found his girlfriend and more than 100 kilograms of cocaine, which the Government says Defendant admitted were his.

---

[1] Both DEA agents and task force officers participated in the investigation at issue in this case. For simplicity's sake the Court uses "officer" to refer to both.

Defendant moved [46] to suppress the physical evidence recovered from the search of his apartment, as well as certain statements he made, arguing that (1) the initial stop was unconstitutional because the Government lacked reasonable suspicion, (2) the initial stop was unconstitutional because it occurred without probable cause in the curtilage of the apartment, (3) the initial stop was unconstitutional because the Government prolonged it to investigate unrelated crimes, (4) Defendant's girlfriend's consent to search the apartment was invalid, and (5) the Government obtained statements from Defendant in violation of his Fifth Amendment Rights.

In early 2017, the Drug Enforcement Agency ("DEA"), working with local law enforcement, was investigating a Mexican drug-trafficking organization with ties to Chicago. [132] at 6. The DEA had a cooperating source ("CS") in contact with a Mexican drug supplier, who told the CS that a large cocaine shipment had been sent to Chicago. *Id*. The CS told the drug supplier that he had wholesale customers in Chicago. DEA agents provided the phone number and code name of an undercover officer ("UC") to play the role of a customer. *Id.* at 7. The CS provided the DEA with the code name of the supplier's contact in Chicago ("Pancho"), as well as a serial number from a dollar bill, which the UC could use to verify the supplier's identity. *Id*.

On May 22, 2017, "Pancho" (later determined to be co-defendant Jesus Soberanis) called the UC and provided the same serial number that the CS had given the DEA. During recorded calls on May 22, the UC asked Soberanis how many kilograms of cocaine were available and what the price was for the cocaine. *Id*. at 7-8. Soberanis said that he had one kilogram for sale and twenty-four more were available, if the UC liked the cocaine. Soberanis told the UC to "call down south" to Mexico for the price. *Id.* at 8-9. From this, the DEA agents inferred that Soberanis was a courier and someone else was supplying him with narcotics. *Id*. The DEA then obtained an order from the Circuit Court of Cook County for GPS location information on Soberanis's phone.

*Id*. at 10, 53. Using the GPS location information, officers began surveilling Soberanis at a location on West Schubert Avenue.

On May 23, 2017, around 3:33 p.m., the UC called Soberanis and agreed to take one kilogram of cocaine and discuss the remaining twenty-four kilograms later. Soberanis and the UC agreed to meet at a store parking lot at Cicero and Diversey forty-five minutes later to conduct the transaction. A few minutes after that call, law enforcement officers conducting surveillance of Soberanis watched him exit the location on West Schubert Avenue and enter a dark-colored GMC Envoy. They followed Soberanis's vehicle and, monitoring the GPS location of "Pancho's" phone, saw the phone traveling with the Envoy. [132] at 12-13. Officers watched Soberanis drive into a grocery store parking lot on West Grand Avenue and park his vehicle. Officers then saw a man, later determined to be Defendant, walk through a hard rain to Soberanis's Envoy and lean into the open passenger window. *Id.* at 15, 103. The officers could not see whether Defendant had anything in his hands. *Id*. at 103. After a few moments, Defendant left, got into a different vehicle, and drove away. Soberanis drove in a different direction. At no point did officers see either man enter the grocery store. *Id.* at 16. The officers split their surveillance team and followed both Soberanis and Defendant. At approximately 3:40 p.m., Defendant pulled into a residential alley between Oak Park Avenue and Newcastle Avenue. Four officers were following him, each in his own car. As the door of a detached garage on the side of the alley began to open, officers activated their lights and initiated a stop of Defendant.

Officers approached Defendant's car and asked for identification, in English. Officers asked if he lived at the residence, and he answered "no." [132] at 28-29. When asked why he had a garage door opener for a residence he did not live in, Defendant said he did not live at the address or know who lived there. Defendant then said his cousin lived at the residence, but told officers

3

he did not know his cousin's name. Defendant also said his brother lived in the basement apartment of the residence but told officers he did not know his brother's name. *Id.* at 30. Defendant spoke with officers in English and appeared to have no trouble understanding the conversation. *Id*. at 30-31.

Officers then took Defendant's cell phone and keys, handcuffed him, and put him in one of the officer's vehicles. One officer remained with Defendant, and the other three walked through the back yard and approached the back door of the residence. They encountered a man coming out of the basement residence who identified himself as the landlord of the building. He told the officers that he owned the building and rented the first-floor unit to a Hispanic male missing an ear, a description that matched Defendant, and a woman who was pregnant. *Id.* at 37-38. While in the landlord's basement unit, officers heard the floor creaking in the first-floor unit above them. *Id.* at 111.

Officers then went to the rear entrance of the first-floor apartment. One officer inserted a key from Defendant's key ring into the door to confirm that it fit the lock, then removed the key without using it to open the door. *Id*. at 39-40. The officers knocked on the door, and Defendant's six-months-pregnant girlfriend answered. They identified themselves as police and asked if anyone else was in the apartment. Defendant's girlfriend said "No," and the officers asked if they could check the apartment to confirm her answer; she agreed and moved out of the way of the door.[2]

One officer stayed with Defendant's girlfriend near the back door of the apartment while two others conducted a protective sweep of the residence. On the kitchen table, the officers saw a large scale, several rolls of duct tape, plastic baggies, and markers, which they believed were tools

---

[2] Defendant's girlfriend disputes this version of events, as discussed below.

4

of the drug trade. In the main bedroom, the officers opened a closet with a sliding door and a large armoire; in both, officers saw several bricks of a white powdery substance, later identified as cocaine. [132] at 42-43. The officers returned to Defendant's girlfriend, who at that point refused to sign a written consent form authorizing the agents to search the apartment, and asked the officers to leave. Believing that the discovery of the bricks in the apartment permitted a continued search, officers conducted a more thorough search of the residence, recovering additional evidence including more cocaine.

Shortly after the cocaine was discovered, a Spanish-speaking officer arrived at the apartment. Officers moved Defendant from the patrol car into the apartment, though not the same room as his girlfriend. The Spanish-speaking officer advised Defendant of his *Miranda* rights, in Spanish, and Defendant said he was unwilling to answer questions. [133] at 26, 28. The officer advised Defendant's girlfriend of her *Miranda* rights, also in Spanish. *Id*. at 28-29. She, too, said she was unwilling to answer questions. *Id.* at 29. Officers brought both Defendant and his girlfriend to the rear of the residence, where they separately began the booking process for each, beginning with Defendant. During the booking process, Defendant said to the officers, in Spanish, "That's all mine." *Id*. at 31. An officer asked what was all his, and Defendant said, "The cocaine." *Id.* at 32. Defendant was arrested; his girlfriend was not.

Defendant was charged with conspiracy to possess a controlled substance with intent to distribute, and with possession of a controlled substance with intent to distribute. See [15]. Defendant filed a motion [46] to suppress statements and physical evidence. The Court held two evidentiary hearings on the motion. At the first hearing, Special Agent Donald Wood and Task Force Officer Chris Chmelar testified about the stop of the Defendant and search of his apartment, as well as the investigation preceding their contact with Defendant. See [132] and [133]. Task

Force Officer Carlos Huertas also testified about reading *Miranda* rights to and speaking with Defendant and his girlfriend. See [133]. At the second hearing, Defendant's girlfriend testified about the officer's search of the apartment and the alleged deal that Defendant made with the officers, in which he claimed the cocaine was his in order to keep the officers from arresting his girlfriend. See [92].

## II.     Legal Standard

The Seventh Circuit has described "the resolution of a motion to suppress" as a "fact-intensive inquiry" in which the district court must make "credibility determinations" based on "its opportunity at the suppression hearing to hear the testimony and observe the demeanor of the witnesses." *United States v. Kempf*, 400 F.3d 501, 503 (7th Cir. 2005); see also *United States v. Springs*, 17 F.3d 192, 194 (7th Cir. 1994) (explaining the deference given to the credibility determinations of the district judge who has "heard the conflicting testimony, observed the witnesses, and then reached a determination about whom to believe").

## III.    Analysis

### A.     The Initial Stop

Defendant moves [46] to suppress evidence seized from his apartment on the grounds that the stop of the Defendant's car was unconstitutional for three separate reasons. First, Defendant argues that the stop was unconstitutional because officers lacked reasonable suspicion that he was engaged in criminal activity. Second, he argues that the stop was unconstitutional because it occurred on the curtilage of his residence and the officers lacked probable cause. Third, he argues that the stop was unconstitutional because the officers prolonged it to investigate other crimes not related to the stop. The Court addresses and rejects each argument in turn.

####     1.     *The Stop Was Supported by Reasonable Suspicion*

Defendant argues that the officers stopped Defendant on nothing more than a hunch, because they had no articulable facts that could support an objectively reasonable suspicion that Defendant had committed a crime or was about to commit a crime. The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. Ordinarily seizures are "reasonable" only when supported by probable cause to believe an individual has committed a crime. See, *e.g.*, *Dunaway v. New York*, 442 U.S. 200, 213 (1979); *Bailey v. United States*, 568 U.S. 186, 192 (2013); *Matz v. Klotka*, 769 F.3d 517, 522 (7th Cir. 2014). The longstanding exception to this rule arises under *Terry v. Ohio*, 392 U.S. 1 (1968), which authorizes brief investigatory detentions based on the less demanding standard of reasonable suspicion that criminal activity is afoot. *Id*. at 21–22; *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005).

Reasonable suspicion exists when an officer can point to "'specific and articulable facts which, taken together with rational inferences from those facts[,] reasonably warrant that intrusion.'" *Baskin*, 401 F.3d at 791 (quoting *Terry*, 392 U.S. at 21). When making reasonable suspicion determinations, courts "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotations omitted); *United States v. Richmond*, 924 F.3d 404, 411 (7th Cir. 2019). Reasonable suspicion requires more than a hunch but less than probable cause and "considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Ultimately, determining whether reasonable suspicion exists is not an exact science, and "must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125. Courts consider the sum of all of the information known to officers at the time of the stop. *Terry*, 392 U.S. at 22–

7

23; *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003). That includes considering the context of what may otherwise be innocent behavior. *Baskin*, 401 F.3d at 793 ("[B]ehavior which is susceptible to an innocent explanation when isolated from its context may still give rise to a reasonable suspicion when considered in light of all the factors at play."); *United States v. Fiasche*, 520 F.3d 694, 697–98 (7th Cir. 2008).

As an initial matter, Defendant was seized when offices stopped his car. A person is "seized" when, by means of physical force or a show of authority, his freedom of movement is restrained. *United States v. Griffin*, 652 F.3d 793, 798 (7th Cir. 2011) (quoting *United States v. Mendenhall*, 446 U.S. 544, 553, (1980). A seizure occurs only if, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554. In this case, officers turned on their emergency lights, law enforcement vehicles blocked Defendant's vehicle from moving, and officers ordered him to step out of his car. [132] at 67-70. After Defendant was physically blocked from leaving, he complied with officers' orders. Under these circumstances, a reasonable person would not feel that he was free to leave. See *United States v. Bady*, 503 F. App'x 481, 484 (7th Cir. 2013) (officers' use of emergency lights and attempt to position their car to block in defendant's vehicle "unquestionably qualify as shows of authority"); *United States v. Green*, 111 F.3d 515, 520 (7th Cir. 1997) (officers' use of patrol car to block defendant's vehicle's exit constituted a seizure); *United States v. Packer*, 15 F.3d 654, 657 (7th Cir. 1994) (officers parking vehicles in front of and behind defendant's vehicle constituted a seizure).

The circumstances relevant to assessing whether officers had reasonable suspicion supporting the stop are as follows: a CS told DEA agents that a large shipment of cocaine was sent to Chicago; working with the DEA, the CS brokered a deal between the Mexican supplier and a

UC posing as a wholesale buyer in Chicago; the CS provided a code name ("Pancho") and a dollar bill serial number for the UC to verify the distributor's identity; Soberanis called the UC, identified himself as "Pancho," and provided the serial number that the CS obtained; Soberanis stated that he would deliver one kilogram and had twenty-four more available; Soberanis did not provide a price for the kilogram and told the UC to "call down south" to Mexico to get the price (suggesting that he was a was a courier in the transaction and someone else supplied him with cocaine); through a court order, the DEA tracked the location of Soberanis's phone number to a home on West Schubert in Chicago; on May 23, 2017, the UC and Soberanis had a telephone conversation at approximately 3:33 p.m., in which Soberanis stated that they could meet at a store at Diversey and Cicero in forty-five minutes to complete the sale of one kilogram of cocaine; DEA agents then observed Soberanis leaving the West Schubert location in a GMC Envoy, and the location of the phone travelled with the Envoy as they followed him; about two minutes later, Soberanis arrived at a grocery store on West Grand Avenue, where he met Defendant; Defendant approached Soberanis's vehicle in hard rain and leaned into the window of Soberanis's Envoy for a short period of time; Defendant and Soberanis then left separately in their vehicles; Defendant was not carrying groceries and did not go into the grocery store after meeting Soberanis; and Soberanis did not exit his vehicle or go into the grocery store.

Considering the sum of the information known to the officers at the time of the stop, and the rational inferences from the available facts, the Court concludes that when the officers stopped Defendant's car, they had reasonable suspicion that he was involved in the sale or distribution of narcotics. In particular, Defendant met Soberanis minutes after he set up a drug deal with an undercover DEA agent; the agents had reason to believe that Soberanis was a courier, not the supplier; Defendant talked to Soberanis while standing in the rain, and neither Defendant nor

9

Soberanis did any shopping at the grocery store whose parking lot they met in. "[W]hen considered in light of all the factors at play," Defendant's behavior and the other facts known to officers provided reasonable suspicion justifying the initial stop of Defendant. *Fiasche*, 520 F.3d at 697–98.

2. *The Stop Was Not on the Apartment's Curtilage*

Defendant argues that the officers stopped him in the curtilage of his apartment and, because they lacked probable cause, the stop was unconstitutional. "Curtilage—the 'area immediately surrounding and associated with the home'—is entitled to the same Fourth Amendment protection as the home itself." *Richmond*, 924 F.3d at 413 (citing *Florida v. Jardines*, 569 U.S. 1, 7 (2013)).

The parties dispute the exact location of Defendant's car when the officers stopped it. The Government says the car was in the alley. See [112] at 4. Defendant says it was in the garage (see [101] at 8), asserting, "In this case, [Special Agent] Wood testified that Mr. Ramirez 'pulled into a garage' when the officers stopped him," citing [132] at 95. That quoted phrase is taken out of context. When asked why he made the decision to stop Defendant's car, Agent Wood testified, "Because we saw that he pulled into a garage and he was going to go into that garage, and we wanted to talk to him before he got into the garage." [132] at 95. Moreover, when Agent Wood was asked directly whether Defendant's car had made it into the garage at the time of the stop, Agent Wood testified, 'No…. It was parked in the alley behind the garage." [3132] at 26-27. Furthermore, Officer Chmelar testified that, when he pulled into the alley, he saw Defendant's car stopped, and he later moved it into the garage. [132] at 106-109. The evidence before the Court establishes that Defendant's car was in the alley, not in the garage, when law enforcement officers

stopped it. For that reason, Defendant's argument fails, and the Court need not address whether that particular garage fell within the curtilage of the building.[3]

### 3. Officers Did Not Prolong the Stop

Defendant also argues that the stop was unconstitutional because the officers prolonged it to investigate crimes not related to the purpose of the stop. A traffic stop, Defendant says, is reasonable only for the amount of time it takes to complete "the seizure's 'mission'—to address the traffic violation that warranted the stop ... and attend to related safety concerns ...." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). This includes "certain unrelated checks during an otherwise lawful traffic stop." *Rodriguez*, 135 S. Ct. at 1615. "An officer's inquiries into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

The purpose of stopping Defendant in his vehicle was both "to identify who [Defendant] was" and also to "determine what role he had in the current investigation that [the DEA was] conducting." [132] at 95. After being stopped, Defendant provided identification, but gave confusing, nonsensical answers to simple questions. He denied living at the residence (which officers later determined was not true) and said he did not know who lived there. Defendant had no explanation for why he had a garage door opening for a residence he did not live in or know

---

[3] Such a determination would require assessing what expectation of privacy Defendant had in the garage, considering that the building it was attached to housed multiple, separate tenants. See, *e.g.*, *United States v. Shaffers*, 2018 WL 3141825, at *5 (N.D. Ill. June 26, 2018) (concluding car was not within curtilage when it was parked in a shared driveway of tenants in multi-family building that was separated from the building by stairs and a short fence). And even if the garage were part of the curtilage, that does not necessarily mean the stop was unreasonable. See *United States v. Pace*, 898 F.2d 1218, 1229 (7th Cir. 1990) (assuming (without deciding) that a condominium garage was part of curtilage, police stop of suspected mob assassin in the garage was still reasonable under the Fourth Amendment).

the residents of. Then he said his cousin lived there (also not true) but he did not know his cousin's name, and also that his brother lived in the basement unit (again, not true) but he did not know his brother's name. Defendant's shifting and conflicting answers could not all have been true, and by the end of this brief interaction, when officers handcuffed Defendant and put him in a car, Agent Wood had probable cause to arrest him for making false statements to a federal agent. See 18 U.S.C. § 1001. The Government did not prolong the stop; rather, Defendant quickly provided probable cause for his arrest and reasons to investigate further.

Furthermore, after Defendant's suspicious answers about the residents of the building and his business there, it was reasonable for officers to continue their investigation by going to the building and speaking with the residents about Defendant. Doing so would help identify what he was doing there and perhaps clarify his relationship to the DEA investigation. The time officers took to speak with the landlord in the basement unit and with Defendant's girlfriend at the door of the apartment was not a prolonging of the stop to investigate unrelated crimes; it was a basic investigation and obvious consequence of Defendant's puzzling and conflicting answers to the officers' questions.

### B. The Search of the Apartment

Defendant suggests that officers illegally entered and searched his apartment because officers never asked Defendant's girlfriend for consent to the search, and even they did, their stop and seizure of Defendant rendered his girlfriend's consent to the search invalid. The Court rejects both assertions.

As noted above, the Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. With few exceptions, the Fourth Amendment generally requires that the issuance of a

warrant supported by probable cause precede any search. *Stanley v. Henson*, 337 F.3d 961, 963 (7th Cir. 2003). Evidence that is seized during an unlawful search cannot be used against the victim of the unlawful search "unless the government can show that it was obtained as a result not of the illegality, but rather 'by means sufficiently distinguishable to be purged of the primary taint.'" *United States v. Swift*, 220 F.3d 502, 507 (7th Cir. 2000) (quoting *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)). The Fourth Amendment's probable cause and warrant requirements do not apply, however, where an authorized party voluntarily consents to a search. *United States v. Johnson*, 427 F.3d 1053, 1056 (7th Cir. 2005) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Melgar*, 227 F.3d 1038, 1041 (7th Cir. 2000)). The officers in this case did not have a warrant to search Defendant's apartment.

They did, however, have permission. The officers testified credibly that they knocked on the door and asked Defendant's girlfriend if they could check the apartment to see if anyone besides her was present, and she said yes and moved out of the way to allow them into the unit. [132] at 40-41; [132] at 113; [133] at 4, 20. Thus, the officers had a right to search the apartment as far as necessary to see if anyone else was in it. See *United States v. Breit*, 429 F.3d 725, 730 (7th Cir. 2005) ("As this court has recognized, '[g]overnment agents may not obtain consent to search on the representation that they intend to look for only certain specified items and subsequently use that consent as a license to conduct a general exploratory search.'" (alteration in original) (quoting *United States v. Dichiarinte*, 445 F.2d 126, 129 (7th Cir. 1971))). While conducting that search, the officers could seize materials in their plain view, so long as the incriminating nature of the material was immediately apparent. *Horton v. California*, 496 U.S. 128, 136 (1990); *United States v. Key*, 889 F.3d 910, 912 (7th Cir. 2018)

After Defendant's girlfriend consented to the officers entering the apartment, they immediately saw on the kitchen table a scale, duct tape, markers, and baggies. [132] at 41-42; [133] at 5. The officers identified these implements as "tools of the trade" for narcotics traffickers, and they were entitled to seize the items. See *Key*, 889 F.3d at 912–13 (officers may seize items in plain view where they have entered a residence based upon limited consent to search for a person); see also *United States v. Walton*, 827 F.3d 682, 687 (7th Cir. 2016) (officers may rely on their experience to make inferences from and deductions about the cumulative information available) (citation omitted). Those items also raised concerns about officer safety, because "[u]sually places with narcotics have guns or people guarding narcotics." [132] at 42; [133] at 5. The officers moved towards the first bedroom on the left and looked in two areas where a person could be hiding—a closet and a large armoire. [132] at 43-44, 96; [133] at 6-8. They were entitled to look in these places, both because Defendant's girlfriend consented to their search of the apartment for other persons and because warrantless protective sweeps for officer safety are justified. *Leaf v. Shelnutt*, 400 F.3d 1070, 1087 (7th Cir. 2005) (protective sweeps are justified by officer's need to ensure their safety when lawfully entering a private dwelling and are not limited to sweeps incident to arrest). Officers found kilogram bricks of cocaine in both places, and a large lump under the bed covers turned out to be more bricks of cocaine. [132] at 45-46; [133] at 6-9.

When looking at the totality of these circumstances, the officers' testimony that they immediately recognized these items as incriminating is credible, so the discovery and subsequent seizure of the evidence was permissible under the plain view doctrine. *Key*, 889 F.3d at 913. With Defendant's girlfriend's consent and under the plain view doctrine, the search that turned up almost all of the cocaine in the apartment—approximately 100 of the 102 kilograms—did not violate the Fourth Amendment.

At this point, Agent Wood asked Defendant's girlfriend to sign a consent to search form, but she refused and said she did not agree to any searches. Officer Troutman, still confirming that the apartment contained no other people, found additional cocaine in the kitchen next to the sink and on a glass top table on the porch. [133] at 12. There was more cocaine on the dresser, next to Defendant's girlfriend's mirror and makeup. [92] at 32-34. Even if Defendant's girlfriend revoked her consent to the search before Officer Troutman found the additional cocaine, suppression is not justified. Agent Wood testified in the hearing that, if he had been told that the agents could not do any further searching or securing of evidence without a search warrant, he would have "ceased [searching] and looked to obtain a search warrant." [132] at 48. The 100 kilograms the officers had already discovered would have provided a clear basis for a search warrant, had the agents known they needed one, making discovery of the additional evidence inevitable. See *United States v. Brown*, 328 F.3d 352, 356 (7th Cir. 2003) (holding that although agents "reasonably should have known[] that they did not have valid consent to search" the apartment, inevitable discovery rule applied because prosecutors would have sought a warrant had they "known of the defect in the consent" and the exclusionary rule "should not be used to make the person whose rights have been violated better off than he would be if no violation had occurred").

Defendant's girlfriend gave a different account of events, which the Court addresses briefly. According to her testimony, she was sitting in the apartment that afternoon, got up off the couch when she heard noises, and saw three men in the doorway to the kitchen saying "policia." [92] at 10-12. Effectively, she claims that the officers opened the door with the key, walked through the mudroom and into the apartment, and then announced themselves. When talking to officers, she denied that she knew at that point that there was cocaine in the house or that Defendant

sold cocaine ([92] at 38, 58-59)—despite sleeping in the bedroom where most of the cocaine was found, and despite officers finding cocaine on the dresser next to her mirror and makeup. [92] at 32-34. At the suppression hearing, she claimed that she had never seen any of the 102 kilograms of packaged cocaine in the apartment before the officers recovered it that afternoon. [92] at 34-35. She testified that she never gave the officers permission to enter and search the apartment, and that one of the officers told her "he was going to say that [she] had given permission to come into the apartment." [92] at 12-13.

The Court does not find Defendant's girlfriend's testimony credible. Some of her answers were evasive and others defy common sense. Additionally, Defendant was her partner and is the father of her child, and at the time she testified, she knew that Defendant was in jail because the officers had found the cocaine at the apartment when she let them in. [92] at 51. In the Court's judgment, her testimony was not credible, and where it conflicts with the officers' consistent and credible testimony, the Court credits the officers' testimony.

Defendant also argues that his girlfriend's consent was not valid because "it was the product of the agents' illegal stop and seizure" of Defendant. [116] at 6. The Court already determined that the stop and seizure of Defendant was legal, so it need not address whether an illegal stop and seizure of one person invalidates a different person's later consent to a search.

C. **Defendant's Statements**

Defendant argues that officers interrogated him after he asserted his right to remain silent and used "psychological intimidation" to elicit incriminating statements. [101] at 11. He now moves to suppress those statements. A person who is interrogated while in police custody has the right to request the assistance of a lawyer. *Miranda v. Arizona*, 384 U.S. 436, 469–70 (1966); *United States v. Jackson*, 189 F.3d 502, 510 (7th Cir. 1999). Once a suspect invokes the right to

counsel, the police must cease all interrogation until counsel is present, unless the accused himself initiates further communication. *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981); *Jackson*, 189 F.3d at 511. If police improperly interrogate the accused after he has invoked his right to counsel, any incriminating statements he makes are inadmissible. *Edwards*, 451 U.S. at 487. However, not "all statements obtained by the police after a person has been taken into custody are considered the product of interrogation." *United States v. Hendrix*, 509 F.3d 362, 374 (7th Cir. 2007). By "its own terms, *Miranda* does not apply to volunteered statements." *Andersen v. Thieret*, 903 F.2d 526, 532 (7th Cir. 1990); see also *United States v. Jones*, 600 F.3d 847, 854 (7th Cir. 2010). "Voluntary incriminating statements are not subject to *Miranda* warnings and are admissible as evidence." *United States v. Swanson*, 635 F.3d 995, 1001–02 (7th Cir. 2011) (citations omitted). If a defendant makes a statement in response to words or actions by the police that do not constitute interrogation or if the defendant himself initiates further communications, the police are not prohibited from "merely listening" to his voluntary statement. *Edwards*, 451 U.S. at 485; *United States v. Jones*, 600 F.3d 847, 855 (7th Cir. 2010). Officers do not violate *Miranda* by asking clarifying questions to spontaneous statements. *Andersen*, 903 F.2d at 532. Nor do they violate *Miranda* by asking a "routine booking question." *United States v. Hernandez*, 751 F.3d 538, 540 (7th Cir. 2014) (citing *Pennsylvania v. Muniz*, 496 U.S. 582, 601–02 (1990)).

Defendant argues in his brief that after officers read Defendant his *Miranda* rights, he said he did not want to answer questions and requested a lawyer, but officers continued asking questions designed to elicit incriminating responses. [101] at 12. The record does not support that version of events. Officer Huertas testified that he read Defendant his *Miranda* rights in Spanish, and Defendant said he did not want to answer questions. [133] at 27-28. Officer Huertas then went to Defendant's girlfriend and began informing her of her rights, rather than continuing to question

17

Defendant. *Id.* Agent Wood testified that he later heard that both Defendant and his girlfriend had asked for attorneys. [132] at 89.

The evidence before the Court does not show that the officers continued to interrogate Defendant after he invoked his *Miranda* rights. Interrogation is defined as "express questioning" or "any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (emphasis added). During the booking process, officers were filling out the relevant form based at least in part on Defendant's identification. [133] at 30. To the extent that officers asked Defendant questions in order to fill out the form, they do not run afoul of *Miranda*. *Muniz*, 496 U.S. at 601–02; *Hernandez*, 751 F.3d at 540; *United States v. Knope*, 655 F.3d 647, 652 (7th Cir. 2011).

Officer Huertas testified that during the booking process, he was interpreting, Officer McCabe was filling out the form, and Officer Asselborn was standing nearby, not speaking. *Id.* at 30-31. Defendant looked at Officer Asselborn and said in Spanish, "That's all mine." *Id*. at 31. With Officer Huertas translating, Officer Asselborn asked, "What's all yours?" Defendant answered, "The cocaine," which officers had moved out of the bedroom and stacked on the kitchen table. Officer Asselborn followed up, "What cocaine?" and Defendant specified "The cocaine on the table." Defendant's initial statement was volunteered, not given in response to any question that would elicit incriminating answers. Officer Asselborn's responsive question was a neutral response intended to clarify Defendant's statement, not coercive interrogation that *Miranda* seeks to prevent. *Andersen*, 903 F.2d at 532. Therefore, Defendant's statements "That's all mine," "The cocaine," and "The cocaine on the table" were not elicited in violation of the Fifth Amendment.

According to Defendant, however, the officers "psychologically intimidated" him into making incriminating statements. The argument is not entirely clear, but it seems to rely on Defendant's girlfriend's testimony that officers told her she would not be arrested if she answered questions, because Defendant had made a deal with them. [92] at 18. She also said that Defendant told her he had made a deal with the officers, in which he claimed the cocaine was his in order to keep his six-months-pregnant girlfriend from being arrested. *Id.* at 18-21. Officer Huertas testified that those exchanges never happened: he neither made nor heard any threats, including that Defendant's girlfriend would be arrested if Defendant did not claim the cocaine. [133] at 29, 33-34. Officer Chmelar also testified that he never heard any officers say anything threatening after Defendant was brought back into the house. [132] at 13. It is true that the officers began booking Defendant's girlfriend, presumably because they found her in an apartment containing tools of the drug distribution trade and 102 kilos of cocaine. *Id.* at 31. Maybe the thought of her going to jail motivated Defendant to speak up. But the Court does not credit the testimony from Defendants' girlfriend that officers made a deal with Defendant to avoid his girlfriend's arrest. Because that is the only evidence Defendant cites in support of suppressing his statements, and the Court sees no other evidence supporting the argument, the Court finds that Defendant's statements were volunteered and declines to suppress them.

IV.    **Conclusion**

For the reasons stated above, Defendant's motion to suppress [46] is denied. This case remains set for further status hearing on November 5, 2019 at 9:00 a.m.

Dated: October 16, 2019

_____
Robert M. Dow, Jr.
United States District Judge